And we will turn to the last two cases on our day calendar. Weiss et al. v. National Westminster Bank PLC and Moses Strauss et al. v. Credit Lyonnais. These are related or companion cases, but they are not formally consolidated. We will proceed from case to case with the hope that arguments will not be repeated unnecessarily. And of course, we have, I think, in both cases, identical or almost identical set of attorneys, and we look forward to hearing from them. Let's begin with Weiss v. National v. National Westminster Bank PLC and Moses Strauss et al. v. Credit Lyonnais. Do we have an appellant's counsel ready to go? Hello? I'm sorry. This is Peter Ravenhansen. May it please the court? I represent the appellants and the plaintiffs below, also the cross appellees on the bank's personal jurisdiction appeal. Because the Justice Against Sponsors of Terrorism Act, JASTA, most recently authorized civil aiding and abetting liability for material support, and because we believe it's the best fit for the plaintiff's claims, I'd like to start with the aiding and abetting claims and focus my argument on three points. First, the district court conducted no independent analysis whatsoever of whether the correct standard for aiding and abetting liability was satisfied. Instead, it erroneously substituted the definitional requirements for an act of international terrorism in a single conclusory paragraph at the end of the opinion. But in Lindy, this court held that an aiding and abetting plaintiff does not have to prove that the definitional requirements for an act of international terrorism have been satisfied. And the court did no other analysis for aiding and abetting. Secondly, the bank here not only knew that it was providing material support for a foreign terrorist organization as it has conceded, and as the district court assumed for purposes of these summary judgment motions, but it also repeatedly flagged its customer, Intrapal, on suspicions of terror financing, not just two or three, but multiple times in its records. It now claims that the suspicions it had never rose to the level of absolute certainty or the standard required for a criminal conviction, but that's not the standard for aiding and abetting. And the literal red flags in its records raised a genuine dispute about its awareness of its role for aiding and abetting purposes, which the district court should not have decided for itself. And third, the district court found in its 2017 opinion, it's called Weiss Roman Numeral 4 by its enumeration, that there was sufficient evidence to create a dispute whether Hamas caused the attacks and whether the risk of the attacks was foreseeable. So the issue for aiding and abetting liability that remains then is whether the bank gave substantial assistance to Hamas, the attacker. And in Lindy, this court also addressed that issue and said there are multiple factors that make up substantial assistance and that weight to be given them is best left to a first point in a little more detail. Lindy held, as I stated, that the aiding and abetting plaintiff doesn't have to prove the definitional requirements for an act of international terrorism. The standard instead is that drawn from the Halberstam versus Welch case, which Congress specified as the proper legal standard for the new JASTA aiding and abetting liability. And it is that the defendant must be generally aware of its role as part of an overall illegal tortious activity, and that's the language from Halberstam, from which a wrongful act that caused the injury was a reasonably foreseeable consequence. So on the facts of Halberstam itself, the defendant, Linda Hamilton, was held liable for aiding and abetting an unplanned murder. Despite the fact that she had no knowledge that a murder would take place or even a burglary, she was only generally aware that she was assisting some kind of personal property crime from which violence was a risk. Here, that translates, and Lindy and this court in Siegel translated it in part into a general awareness that the aider and abetter of the bank is assisting terrorist activities from which a risk of terror attacks is foreseeable. It would have been enough also if the bank knew that it had actually assisted an act of international terrorism, but that's the wrong that caused the injury. And just as in Halberstam it was not necessary that the aider and abetter knew that she was assisting a murder, it wasn't necessary, though sufficient here, that the bank knew it was assisting an act of international terrorism. In fact, the court found that there was a genuine dispute whether the bank knew that it was providing material support to a foreign terrorist organization and whether it was foreseeable that a terrorist act would result. And then on the record, we contend that there is clearly dispute whether it was generally aware of its role in financing Hamas from which its terror attacks could be foreseen. I don't want to spend much time on it, but from 1990 on, the bank filed internal suspicious activity reports in 92. In 96, it attached an article describing its customers' support with wire transfers for payments for families of suicide bombers. In 2001, it received a report that said the customer was a front for Hamas operatives and cells, which it immediately filed again its own files as suspected terror financing. In November, it again made a file indicating suspected terror financing with respect to incoming payments to its customer Interpol. In June of 2002, it described Interpol as one of its primary donors, the Al-Aqsa Foundation, as a possible umbrella for funding terrorism in the Middle East. And yet, it processed more than 20 transfers worth $1.7 million from the Al-Aqsa Foundation to Interpol. And then even after the United Kingdom, its own regulator, designated that donor to Interpol for supporting terrorists under the cover of giving money to widows and orphans, it made another series of transfers from the Al-Aqsa Foundation to Interpol. And then even after Interpol was designated as a specially designated global terrorist by the United States, it continued to make $3.8 million in transfers from Interpol to the Hamas charities in the Middle East. On that record, we think that there is a genuine dispute as to whether the bank was aware of its role in terror financing when the court has already found that there's a dispute whether it was reasonably foreseeable that terror attacks would take place. Let me turn to causation for Hamas. There, the bank has totally missed the Halberstam standard for causation. The very first element in Halberstam v. Welch requires that the principal tortfeasor cause the injury. And just as in Lindy, in this case, there's really no dispute that Hamas committed the acts of terrorism, international terrorism, that injured the plaintiffs. And they committed them and caused them both in the proximate and but-for sense of the word. So the issue that remains for aiding and abetting liability then is whether the bank gave substantial assistance. And that, as Lindy pointed out, is a complicated multi-factor issue. It turns in the first place, of course, on the amount of the assistance. Here, it was a total of $16.5 million over the course of the with a straight face when the record shows at page 553 of the appendix that an attack cost around $500. The relationship here was not a remote or one-time relationship. The bank was the banker for Interpal, which was designated by the United States as Hamas's principal fundraiser. And it was its banker for seven years, and it didn't terminate the relationship even after the U.S. designation. And of course, the underlying wrong, the principal tort is a horrific one, which Halberstam says factors into the termination of substantial assistance. And finally, the assistance was direct because the district court also found here that there's no genuine dispute, or I'm sorry, there is a genuine dispute. We've shown enough evidence to show a genuine dispute, whether the 13 Hamas-controlled charities were in fact Hamas alter egos. And in fact, in Straus, the next case on exactly the same evidence, the court said that there was evidence from which a jury could find that sending money to any of these 13 charities was like sending money directly to Hamas. So in short, aiding and abetting liability to which the district court spent no attention really requires a general awareness of a wrong, or rather of participation in an unlawful activity from which it is foreseeable that the wrong that caused the injury would occur. And we think there's substantial evidence from multiple tariff financing suspicions in NatWest's own records to establish that point. Let me just turn quickly to primary liability. There, the district court found and repeated several times that there was no evidence that any money transferred had been used in the specific attacks on the plaintiffs, or that the charities themselves had committed the attacks. I think that's a specificity that is not required to show the definitional requirements of dangerousness or apparent intent. They're more generic, but in any case, it appears that NatWest has backed away from that claim and now says and quotes the court as saying that providing routine financial services for charitable purposes to Hamas charities cannot be a violent or dangerous act under Section 2331, Paragraph 1. But the question for dangerousness under that definitional requirement for an act of international terrorism is not why the transfers were made, but whether in fact they are dangerous. Excuse me. You have one minute left. Thank you. On that point, the executive branch reported in Holder v. Humanitarian Law Foundation that the answer is emphatically yes, and I'd like to quote it because it actually picks up the words of the district court here. The executive branch said, it is highly likely that any material support to these organizations will ultimately inert to the benefit of their criminal terrorist functions, regardless of whether such support was ostensibly intended to support non-violent or non-terrorist activities. Congress made the same finding when it said that any contribution to a foreign organization facilitates its terrorist acts. And the expert in this case, Dr. Matthew Levitt, same expert that the Supreme Court quoted in Holder, said the same thing in this extensive report that's in the record here. So we have an empirical finding to which the Supreme Court says courts should give significant deference that contributions to Hamas-controlled charities are inherently dangerous, regardless of how they are ostensibly purposed. And the district court's contrary finding only creates a dispute that the jury should have been entitled to resolve. Thank you. Thank you. Judge Kearse, any questions? No questions here. Jacobs? No questions. I have none. And so we'll turn to counsel for defendants. Thank you, Your Honor. Jonathan Blackman at Cleary Gottlieb, representing NatWest, and may it please the court. I didn't hear the words, Lindy mentioned in that argument by my friend, Professor Raven Hansen. And with all respect, it would have sounded like the case had never been decided by this court. Rather, what it sounded like is the argument that he made to the panel, which I think Judge Jacobs was on, in the prior case, where summary judgment was reversed, because this court found that there was a material triable issue on violation of one of the predicate criminal statutes, 18 U.S.C. 2339B, the material support statute. But as the court pointed out in Lindy, that's not enough. It's not enough either for primary liability, where there's a requirement that counsel just gate it over for showing that the defendant itself engaged in violent or life endangering activities and did so with apparent terrorist intent. And it's also not enough for secondary liability under JASTA, whereas this court said in Lindy, the defendant has to be generally aware of its role as part of the terrorist activities of the principal. And indeed, to quote the court, the bank has to be aware that by assisting the principal, it is itself assuming a role in terrorist activities. And also, in addition, that the bank knowingly and substantially assists the principal violation. Well, the evidence in this case, which is massive, doesn't support that. Obviously, this is summary judgment. The record is key. And the record, with all respect, is not what counsel argues, but what's in the joint appendix. And what that joint appendix shows, indeed, as counsel repeated again and again, is that, yes, there's a triable issue of suspicion, or even if you give the plaintiff the benefit of the doubt, knowledge that NatWest's customer, Interpal, was instructing NatWest to send funds to persons associated with Hamas, or even give the benefit of the doubt to Hamas. But that's the 2339B violation. That's the 2339B violation. And the plaintiff's claim is that the bank is not giving the material support to the organization, the foreign terrorist organization. The essence of Linde, the reason why this court in Linde vacated the judgment below is that there's a difference in the organization and the activities. And the plaintiff cannot facilely conflate the two and say, well, you supported the organization. Therefore, you must, in the case of secondary liability, be generally aware that you are playing a part in its terrorist activities. And that is particularly critical on what this undisputed record shows, which is that from day was opened at NatWest, NatWest believed that Interpal was a charity, Interpal represented itself to be a charity. It was indeed a regulated charity in the United Kingdom. It was investigated twice by the UK Charity Commission, which is the official regulator of charities, and determined to be engaging in charitable activities. For every single one of these transfers to any of the 13 charities alleged to be part of Hamas, the internal records of NatWest show without exception that they were expressly designated by Interpal for various charitable purposes, education, health care, food, etc. No indication whatsoever that they were being used for any other purpose. And very significantly, the plaintiff's expert, who we just heard cited, Dr. Levitt, says in his report that these charities, in fact, engage in charitable activities. These charities may be affiliated with Hamas, but they engage in charitable activities. He doesn't deny that. So NatWest records show charitable activities. The plaintiff's expert concedes charitable activities, and the plaintiffs repeatedly have conceded in their expert reports, which are essentially their only evidence in this case, beyond NatWest's own records and testimony, that they're unable to show that there is any connection between these transfers to these 13 charities and any terrorist activity by these charities, any participation by the charities in terrorist activities, any training or funding of terrorist activities, nothing. No connection whatever with terrorist activities. And that disputes and defeats, as a matter of law, in the absence of evidence, the general awareness aspect of secondary liability. It also defeats the substantial assistance aspect. And I just want to touch on the facts of Halberstam, because they're worlds away. In Halberstam, the aider and abetter is the live-in companion in the most intimate relationship possible with the primary wrongdoer. Ms. Hamilton, in effect, keeps the books and records and acts as the back office of the nighttime criminal enterprise. She knows all about it. She goes to the bank and makes the deposit of the proceeds. She receives checks back. She helps file false tax returns to conceal the income on which she and he, the primary wrongdoer, live in a lifestyle which the D.C. Circuit colorfully described as something that would be the envy of a Barbary brigand. So worlds away from our case. We have what this court refers to in Lindy and again in Siegel and in the causation cases which I'll get to, Rothstein and Al-Raji are routine banking services performed for a customer. And while there may be indeed a jury issue about whether those constituted material support to Hamas, that is simply not enough. If it were enough, Lindy would not have come out the way it did and the court would not have decided it. Let me move on to the question of causation. The language of the civil liability provision of the A.T.A. Section 2333A requires injury by reason of an act of international terrorism. We all know that by reason of are words that have a legal significance. It means proximate cause. Those words are taking directly from civil RICO and the Supreme Court has held a Holmes case and this court repeatedly that that's what those words mean. And the same by reason of requirement applies to secondary liability under 2333D, which is another way into liability under 2333A. Moreover, as a matter of the common law of aiding and abetting, which is referred to when JASTA was enacted, referring to federal common law under Halberstam, this court has said repeatedly, in fact, in the SPV OSIS case, which was decided coincidentally on the same day as the court decided Lindy, that proximate cause is an element of aiding and abetting liability. So you can't just say, well, somehow JASTA dispenses that requirement. That would be a very strange tort cause of action since the essence of tort law, as opposed to criminal law, is that the plaintiff has to have suffered an injury caused in some way by the conduct of the defendant. And again, the plaintiffs cannot sidestep that basic requirement by saying, well, there's a tribal issue of violation of 2339B, which is a criminal statute, which of course does not have a causation requirement. Criminal statutes rarely do. I'd like to turn briefly to the question of personal jurisdiction. These cases went on for an awfully long time, and I would submit that they probably would never have been brought if Daimler had been the law at the time, because while there is a passing reference in the complaints to specific jurisdiction, they were really based on including the plaintiffs doesn't apply here. If we look at the question of specific jurisdiction, it's black letter law that there has to be a nexus between the defendant's actions in or directed to the forum and the plaintiff's injury. The claim has to arise out of or relate to the In re Del Valle case, which was a 1782 case, but has a discussion of the requirements for specific jurisdiction. The court makes it clear that that nexus has to have some kind of causal link. The nature of the causal link, as you pointed out in Chu versus Dietrich, depends on the quality of the activities, but there has to be some connection. And here, there is none, because as the plaintiffs concede, while some of the transfers made by NatWest at the instruction of Interpol were dollar transfers of necessity made through correspondent accounts in the United States, as it happened, although it's irrelevant, at NatWest's own branch in New York, there's no connection, whatever, shown between any of those transfers and acts that injured any of the plaintiffs. And while the precise numbers are not necessarily indicative, what it is, the case is that there's roughly $4 million of transfers through the US in total during the entire period of the operation of the account, which was over five years. That compares to what the plaintiff's expert, our friend Dr. Levitt says at page 2346 of the joint appendix, is Hamas receiving $70 million per annum, per annum. So over our same period, roughly $350 million, and we have $4 million of dollars passing through New York at the behest of Interpol. There's clearly no nexus there. I want to go back briefly to primary liability. My adversary, I think, more or less conceded that there wasn't a case for it when he jumped in with secondary liability. But it certainly is the case that under Lindy, you've got to show, as I said earlier, that the defendant himself engaged in violent, life-endangering activities and did so with apparent terrorist intent. Apparent terrorist intent means apparent attempt to coerce or intimidate a civilian population or a government. Well, this is a bank. It's not attempting, and there's no evidence it's attempting to coerce a government. It's engaging, as the bank does for any customer, in making routine financial transactions. Excuse me. You have one more minute. I think that's really the point, and it goes to all of this. Material support is one thing. No one's ever prosecuted NatWest for material support. Civil liability, whether under the primary liability requirements that I just mentioned or under JASTA, is very different, and this record simply does not disclose a triable issue on that point. Thank you, Mr. Blackman. Judge Keirs, any questions? No questions. Thank you. Judge Jacobs. You argued that the banking services are rented to InterPAL, and then clearly on to the charities, for its charitable activities, but why shouldn't we assume that banks above and beyond the law of all know that money is fungible? Banks do know money is fungible. Yes, they sure do. You're arguing a compartmentalization that doesn't really, that seems weakest in the context of a bank. Well, I think with all respect, Congress knows that, but it didn't create a special bank exception to the civil liability requirements, and to take your point to its logical conclusion, material support would be necessarily equivalent to the elements of civil liability because money is fungible, and in the Lindy case, you were dealing with a bank, Arab Bank, and you required more. You pointed out that there might be a triable issue based on proper instructions because Arab Bank did more than simply send money. Arab Bank knew that it was, in fact, sending money to suicide bombers. In one case, it knew it was sending money to a bomb maker, and it was also, through one of its donor transferors, a Saudi committee, in effect, administering a fund for suicide bombers. That was more than just transmitting money, and I think unless the court really wants to kind of back off from Lindy, which I don't think it should do, obviously, then the money fungibility point proves too much and would essentially mean that any time a bank transferred funds for someone whom it suspected to be involved in terrorist activities, the bank became, therefore, liable for any injury committed by that entity, and that's exactly the distinction Lindy drew between supporting the entity and being involved in a meaningful way in the terrorist activities. It goes to the causation point, too, and I think one can't go too far on fungibility. Fungibility was, I think, where the Seventh Circuit went a bit overboard in Boyne III, and this court in Lindy said, you know, that's not enough. Banks always send money. That's what they do, but that's not sufficient to create civil liability. Thank you. Mr. Blackman, this is Judge Cabranes. I want to go back to the personal jurisdiction question and just get your help in trying to understand this record. I take it it's your view that but-for causation is required to establish specific jurisdiction. Is that right? I think, certainly, where there are no other relevant forum-related activities, there has to be but-for causation or something akin to it, and I think in the Chu case, which is actually a bit earlier than the Supreme Court's current move, which, as reflected in specific jurisdiction, I think you said that the issue of causation depends on the strength of the defendant's contacts. But here, the only contacts are, in fact, the transfers of funds, and I would think, under those circumstances, there has to be something close to but-for causation. I don't in writing an opinion need to be categorical about it, but you can certainly say that where all that happens is that dollars pass through New York, which is, by the way, the only way that anyone in the world can ever transfer dollars to anyone else outside the United States, that there's got to be a causal link. Otherwise, you're casting the jurisdictional net really wide, and as the amici point out here from the International Institute of Banking, that, I think, is a troublesome precedent as far as the reach of specific jurisdiction. Let me ask you, are you aware, can you draw our attention to any case that actually supports the to establish an ATA or a JASTA claim? Do we know of anyone, any such case? I think, yeah, well, but-for, maybe not. Proximate cause, you certainly, in ATA cases, in the Al-Rajhi case, which is actually quite similar to this, in that there, the bank was and you clearly there held that proximate causation was necessary. You also, in the Rothstein case, held that proximate causation was necessary in case where, again, the defendants were international banks. But not but-for causation, right? Well, you know, but-for, it's tricky. I mean, as we know from the case law, I mean, traditionally, but-for causation was there as a requirement of tort law, but not enough. You also had to show proximate cause. There are some cases suggesting otherwise, and there's a lot of scholarly writing on it, but certainly, at least proximate cause is needed, if not but-for cause. All right. Let me turn to the matter that you've brought to our attention, the assessment of wire transfer-based personal jurisdiction. And we know that the use of corresponding bank accounts provide a basis for specific personal jurisdiction in some instances, right? It's been held by the court where the use of that account was the essence of the tortious activity, and I'm thinking here of the Lychee case, for instance. And- So, in your view, to comport with due process, the plaintiff's claim has to arise out of the correspondent banking activity. It has to arise out of it, and I think Lychee is a good example of where that happens. There you have the-it's a pleading case, so you're taking the allegations as being true, but there the allegation is that the bank itself was a knowing supporter of Hamas, and an intentional supporter. In fact, had a proclaimed official bank policy of supporting Hamas and supporting the destruction of Israel by Hamas, and the heart of that tort was to utilize the U.S. banking system to support Hamas. That's very different than the ordinary course of banking activity, and that's true even if there is suspicion that the transferee might be connected to a terrorist. It's not, as it was in the case of Lychee, the heart of the case. I mean, here, after all, the majority of transfers were sterling transfers from London, and the only reason the U.S. ever got involved is that the customer said, in this particular case, we want dollars to go to our donee in the occupied territories. Dollars necessarily means New York, and we would say that that is not enough. The use of the U.S. bank was a causal way other than a sort of tautological one with the cause of action, and it's not enough to just say, well, dollars were transferred, and any dollar could, in theory, be used to commit terrorist acts, because that collapses personal jurisdiction, causation, and liability all into we transfer dollars to New York, and we don't think that's right. Now, most of the payments here were made to Interpol. They were not cleared to New York. Is that right? Well, the Interpol account, Interpol had a dollar account and a sterling account at NatWest in London. It had no New York bank accounts. The sterling transfers, which was the majority of the transfers about which plaintiffs complained, obviously had nothing to do with New York, but the sterling transfers did necessarily pass through a correspondent account in New York. All right, let's turn to a final question or two about, which is as often happens here, matters of procedure. How do you respond to the plaintiff's argument that there are tribal issues of fact that preclude summary judgment in your favor? In other words, to what extent are there issues of fact here, and why aren't those issues material so that the obvious result ought to be a remand to permit discovery in the normal course? I think, Judge Cabranes, as I said before, that there really aren't. What the plaintiffs have shown is what they showed the last time we were here, which is a tribal issue on material support, but they have not shown a tribal issue on any of the other required elements under LINDY of either primary liability or secondary liability, and they have not identified those elements in the record. I mean, we've had years of discovery, so it's not like one of the earlier cases you had this afternoon where we're dealing with simply pleadings. We've had years of discovery. I think there are 14 volumes of record here, and I groan sympathetically for the court and your clerks in having to go through those, but if you do, you will see that there is, in fact, no evidence to suggest other than the bank thought it was dealing with a charity, was told by, and its internal records record the fact that every transfer was for a charitable purpose. The plaintiffs admit these were charities. Their only claim is, and again, going back to what Dr. Levitt says, he says in a report where he has various terminologies that the charities were affiliated with or controlled by or connected with or alter egos of Hamas. He's not quite clear which it is, although obviously, legally, that would make a huge difference if you had to get to that point, but you don't because there's no evidence, as he admits, that any of these payments were used for other than charitable purposes or indeed that these charities had anything to do with the attacks on these plaintiffs other than his statement, well, they're connected in some way with Hamas, and our position is, when you're dealing with an international bank where there's clearly no evidence of terrorist intent and no violent or life and danger activities by the bank and no general awareness of itself playing a role in terrorist activities by either these charities, of which there is no evidence, or indeed Hamas, you just don't have a triable case, and there's nothing in the record that contradicts, I believe, anything that I've just said. All right, let's give Mr. Raven Hansen his rebuttal time, but first let me ask whether either of my colleagues has any further questions for you. Judge Kearse? No further questions here, thank you. Judge Jacobs? No, thank you. Okay, Mr. Raven Hansen, what do you have to say about all of this? Thank you, Your Honor. I want to make three points, one on fungibility, one on the Lindy case, and one in specific personal jurisdiction. First, as to fungibility, it's worth noting that in Holder, the Supreme Court said that the empirical question was whether foreign terrorist organizations meaningfully segregate support of illegitimate activities from support of terrorism, and the answer that both the executive branch and Congress gave was no, and the court deferred to it. No one knows better than the banks that money is fungible in that way, and so relying on Hamas' bookkeeping and Chinese walls to keep its charitable contributions from supporting its terrorism is unrealistic, and no bank would believe that. Secondly, Lindy did not hold that a 2239B violation can never satisfy general awareness standards for aiding and abetting liability. It held that it was not enough as a matter of law, and it then corrected the instructional error that the lower court had made on that regard. But on the other hand, we don't claim that a 2339B violation invariably equals general awareness or aiding and abetting. I can give you an example where it wouldn't, and that's if the foreign terrorist organization has basically forsaken violence and joined the peaceful political process. Think Northern Ireland. Then if the bank sends material support to it, it violates 2339B, but the bank could argue that it's not aware that it's supporting terrorist activities. Of course, that's not this case. The bank sent 496 transfers to these 13 Hamas charities at a time when violence was escalating and the bank knew it, and Hamas publicly committed 52 suicide attacks, killing and wounding 1,900 civilians. And the bank knew, at least when its customer was designated, and especially designated global terrorists, that the United States explained that it was one of a web of charities, and I'm quoting, that moved money in ways that hide the money trail, and then the money is often diverted or siphoned to support terrorism. It simply is not plausible that there's no dispute about whether the bank knew where this money was going, despite the fact that Hamas didn't label it, or Interpol didn't label it, for suicide bombing. You have a minute left. And finally, as to specific personal jurisdiction, Mr. Blackman said that some wire transfers went to New York. Actually, the sum is 196 transfers through a New York branch, not through some third-party correspondent account. He also cited Chu for his but-for causation standard. Chu actually says when the contacts with the form of substantial proximate cause is not required, and I think $4.3 million is substantial by any count. And finally, in Rothstein and Al-Raji, this court noted that one of the missing allegations was that any money went to either Rothstein or Al-Qaeda, the organization in Al-Raji. Here, of course, the 475 wire transfers in total all went to entities that the court below said there was a genuine dispute as to whether they were Hamas alter egos. All right, Mr. Raven-Hanson, going to my respect to what you regard as the two or three strongest points as to why there are indeed tribal issues of fact here on this record. Yes. One I would turn to is the actual U.S. designation, which is in the record at Appendix 1035 and thereabouts. I think I would urge the court to read the entire designation because the NatWest has cherry-picked one part. But I think read in its entirety, a jury would certainly find that the customer of NatWest was supporting terrorism. I'd also suggest looking at the suspicious activities reports or what we call internal suspicious activities reports that NatWest filed in 2001 twice that mentioned suspected terrorism or terror financing as the reasons for the report. And also in 2002, with respect to one of Interpol's primary donors, the Al-Aqsa Foundation, which is described as an umbrella for funding terrorism in the Middle East. I think those multiple suspicions alone raise a dispute and raise an inference that NatWest knew full well that its client, I mean, its customer was supporting terrorism. And they also indicate, I think, a dispute about whether it was aware that in processing these wire transfers, it was supporting Hamas in its basically non-segregable terrorist activities. Okay. Thanks very much. We're going to reserve decision.